**ADELINE PRITCHARD HUFF, Plaintiff**

**v.**

**TAUMAOE BROWN and DOES I-X, Defendants**

High Court of American Samoa
Land and Titles Division

LT No. 23-85

January 29, 1993

Before RICHMOND, Associate Justice, TAUANU'U, Chief Associate Judge, MATA'UTIA, Associate Judge.

Counsel: For Plaintiff, John L. Ward II
 For Defendants, Gata E. Gurr

The first trial of this boundary dispute, on January 13, 1987, ended with the court's ruling that plaintiff Adeline Pritchard Huff ("Huff") had failed to prove her case, at least against named defendant Taumaoe Brown ("Brown"). In the court's view, most of the fence erected by Brown appeared to reflect the common boundary between Huff's and the Gurr estate's real properties more accurately than the resurvey submitted by Huff at this trial.[1] Brown, who is related to the Gurr family, was an occupant, but not the owner, of a portion of the Gurr estate's land immediately adjacent to Huff's land. As such, the court further pointed out that this common boundary could not be finally

---

[1] This resurvey, done in 1985 by Meko A. Tua'olo, is one of three recent resurveys in evidence and used by the parties to assist in resolving this common boundary dispute. All three recent resurveys are discussed below.

adjudicated without joinder of the Gurr estate as the owner of the real property defended by Brown. Brown died after the first trial.

On May 22, 1987, the court granted Huff's motion for a new trial and vacated the judgment. The court again suggested the joinder of necessary parties for final adjudication of the common-boundary dispute. When further efforts to reconcile the common boundary did not fully succeed, court-ordered resurveys were authorized, and the Gurr estate was joined as a defendant. The parties also stipulated that at the new trial (1) the common boundary between the parties' real properties would be the only issue requiring adjudication and (2) testimony would be limited to the parties' surveyors. The new trial proceeded in accordance with this stipulation on November 24, 1992, with a site visit on January 22, 1993.

## FINDINGS OF FACT

The parties' real properties at issue are located in an area called "Malaloa" in Pago Pago, American Samoa. A short history of these lands is documented in the file. Both parcels are "freehold lands," as defined in A.S.C.A. § 37.0201(b). Huff's land was transferred in 1896 by Jane S. Foster to Harry Jay Moors, who conveyed it pursuant to a court grant issued in 1897 to one Alafaio. By 1932 the Jewett family had acquired this land, and in 1964 Mary Jewett Pritchard and her husband, Ronald E. Pritchard, transferred it to Huff. Edwin W. Gurr purchased his land between 1900 and 1904, and except for lots conveyed to others at various times, this land descended to the Gurr estate, which presently holds the title.

The Gurr estate's land borders the entire south side and substantially the inland portions of the east and west sides of Huff's land. The land along the remainder of the east side was conveyed sometime in or prior to 1922 by the Gurr family to the Kneubuhl family, who in turn eventually transferred the title to the immediate portion of this tract to Margaret K. Landrigan, the present owner and a Kneubuhl family member. The land along the remainder of the west side was acquired by SSP Co., Inc., during or prior to 1922 and then, no later than 1934, by Burns Philp (SS) Co., Ltd.

Originally, the north side of Huff's land was bounded by the high-water mark of Pago Pago Bay. The then-existing main road crossed her land, for the most part if not entirely, within the legal description in the 1897 court grant ("1897 survey"). In the 1960s, filling moved the

116

shoreline considerably northward, and the road was widened, straightened and essentially relocated outside the northern boundary. During this time, the northern boundary was adjusted to a straight line along the south side of the relocated road. This adjustment did result in some diminution of Huff's land but, as discussed below, does not impact the present common-boundary dispute. The histories of the northern boundaries of Landrigan's and Burns Philp's lands appear to be similar.

Huff's land was described by metes and bounds (showing distances in links, one link being 7.92 inches) in the 1897 survey and in the 1964 deed (probably a mere copy of the 1897 survey). A 1934 resurvey of the Gurr estate's land, which necessarily included the metes and bounds of Huff's land, was apparently done, at least in part, to convert the distances in an earlier survey from links to feet and contained a legal description substantially the same as the description in the first two documents. A fourth document, undated and otherwise unidentified, attempted to retrace Huff's land using distances in feet and reached similar results, but it showed an "error of closure." Omission of one boundary leg is the apparent cause of this error.

According to the 1897 survey and 1964 deed, the point of beginning ("POB") of the metes and bounds in these four documents, whether depicted in survey form or legal description, is "the northwest corner of the high water mark near the mati tree standing on the main road"; and the concluding two boundary legs proceeded "along the high water mark . . . back to the starting point." It actually appears from the survey drawing in the 1897 survey that the mati tree was on the inland side of the old road, the northwest corner was within the road, and the high water mark was a short distance north of the sea side of the road. In any event, the mati tree no longer exists, perhaps the victim of the road work in the 1960s. Moreover, none of the other natural boundary markers, all trees, indicated in the 1897 survey and the 1964 deed still exist in clearly identifiable form. On the other hand, the metes and bounds do refer to the boundary "passing five links (3.3 feet) distant from a concrete wall near the road to the high water mark" at the northeast corner. This reference will be discussed below.

The parties have sought to resolve the common-boundary dispute through the use of resurveys of the legal description in the 1897 survey. These resurveys were done by recognized surveyors, Meko A. Tua'olo in 1985 (the "Meko resurvey"), Mulivanu Tua'olo in 1987 (the "Mulivanu resurvey"), and William A. Sword in 1991 (the "Sword resurvey"). The Meko and Sword resurveys were prepared at Huff's

117

request, while the Mulivanu resurvey was done at the Gurr estate's call.

All three surveyors used virtually identical POBs at the northwest corner of Huff's land, which is also the northeast corner of the immediately adjacent Burns Philp's land. No gap has ever existed between the Huff and Burn Philp properties. Although we do not know when a pin was originally set, a pin was reset there during the last survey of Burns Philp's land in 1977 (the "Burns Philp survey") and a survey pin is located there. Thus, this is a logical POB. However, the positioning of this POB cannot be determined with complete confidence without knowing the precise location of the missing mati tree. Moreover, the POB coordinates on the three surveys are also slightly different from the POB coordinates of the (presumably) same point in the Burns Philp survey. Hence, we cannot be absolutely certain of the POB's accuracy in the three resurveys with respect to the POB in the 1897 survey. Nonetheless, this location is sufficiently accurate as a basis for resolving the present common-boundary dispute and has been mutually accepted by the parties.

The major question in dealing with the three recent resurveys arises with the boundary leg immediately after the initial boundary legs to the south of the POB. The Mulivanu resurvey plots two such legs at slightly different angles immediately south, as the 1897 survey shows, while the Meko and Sword resurveys use a single leg (although the Sword resurvey shows the distances of both legs), coinciding with the same leg in the Burns Philp survey and terminating at an existing pin. This pin was found during the Burns Philp survey, but we do not know when it was first placed there. The discrepancy comes where the 1897 survey next takes a westerly dogleg. The Mulivanu resurvey displays the distance of this leg at a reasonably accurate 75.17 feet, as shown in the 1897 survey. The Meko resurvey shortens the distance to 44.67 feet, while the Sword resurvey shows it at 49.79 feet. There are also fairly substantial directional variations for this leg in the three resurveys. The Sword resurvey is closest to the 1897 survey, but again it exactly follows the boundary shown in the Burns Philp survey, rather than precisely with this leg in the 1897 survey.

Our evaluation of the three recent resurveys indicates that overall the Mulivanu resurvey most closely approximates the 1897 survey. However, the problem is not resolved by this finding. Too many "calls" (the surveyors' term for field evidence) demonstrate that the 1897 survey is not precisely correct and, hence, limit the usefulness of the Mulivanu resurvey to resolve the dispute.

118

A survey pin is located at the northwest corner of Landrigan's land to the east of Huff's land. This pin appears to have been there a substantial period. In any event, no gap between Huff's and Landrigan's properties has ever existed, just as no gap has ever separated Huff's and Burns Philp's properties at the western end. In fact, the driveway leading to a former residential building on Huff's land intersects the main road immediately adjacent to the northeast corner.

The Meko and Sword resurveys do straighten the northern boundary of Huff's property, along the south side of the present main public road. This is contrary to the two legs shown in the 1897 survey and the Mulivanu resurvey. However, the 1897 survey drawing clearly locates the northeast corner on the sea side of the original road. Thus, we are persuaded that the fill and road work in the 1960s resulted in relocating the present road substantially, if not entirely, outside of both the northwest and northeast corners set out in the 1897 survey. Furthermore, although it appears that the concrete wall near the northeast corner, as noted in the 1897 survey, may have disintegrated to some extent, we believe that it was rebuilt at the same location. Hence, we are satisfied that the northeast corner is accurately depicted in the Meko and Sword resurveys, as is, for present purposes, the northwest corner in all three resurveys.

There is additional supporting field information. A pin is located at the southwest corner of Landrigan's land, indicating another point on the eastern boundary of Huff's land. Further south a rock wall with kapok tree fenceposts exists for some distance, again suggesting the boundary line between Huff's land and, at this point, the Gurr estate's land. Along the southern boundary area, near the southwest corner, several 30-foot kapok trees are imbedded with rusty barbed wire, a further sign of the disputed common boundary. Finally, there is a line of mango trees further west of Huff's land, which appears to mark the western end of the Gurr estate's land and to be notably further from the western common boundary, 65 feet according to the 1934 resurvey, than is indicated by the Mulivanu resurvey when the three resurveys are overlaid. The Sword resurvey takes all of this information, and the Meko resurvey some of it, into account in reconstructing the actual boundaries intended in the 1897 survey.

Overlay of the three recent resurveys is also particularly informative in other respects. Using the same POB, in essence, they are closely aligned. The southern boundaries are very close. The only truly significant differences are that the Mulivanu resurvey locates the eastern

and western boundaries further west and creates a gap between Huff's and Landrigan's lands, which has never existed historically and is contradicted by the driveway entering Huff's land. If the Mulivanu resurvey is moved eastward so that its northeast corner coincides with the existing pin, the eastern, southern and western common boundaries in all three recent resurveys become even more closely aligned. The only vital discrepancy is a gap then created between Huff's and Burn Philp's lands at the west end, due to the length of the westerly dogleg in the 1897 survey and Mulivanu resurvey. However, this gap, which has also never existed historically, would only be an issue between Huff and Burns Philp. This issue is not before us now and has no real impact on the present common boundary dispute.

Based on the evidence, we find that the Sword resurvey accurately describes the boundaries of Huff's land, in accordance with the understanding and recognition of the original owners of Huff's and the Gurr estate's lands, and that the differences between the 1897 survey and Sword resurvey are technical errors in the 1897 survey. Thus, we find that the Sword resurvey correctly depicts the common boundary between Huff's and the Gurr estate's lands.

## CONCLUSIONS OF LAW

1. Huff is entitled to have the 1991 Sword resurvey of the freehold land transferred to Alafaio, her antecedent in title by the court grant in 1897, filed with the Territorial Registrar as part of the registration of her title to this land.

2. Huff is entitled to a permanent injunction against the Gurr estate and all persons having ownership or possessory interests in the Gurr estate's land immediately adjacent to Huff's land, derived from or by the authority of the Gurr estate, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from trespassing on or interfering with Huff's land, and requiring removal of Brown's encroaching fence and practicable restoration of this area to its state at the time the fence was erected.

Judgment shall be entered accordingly. It is so ordered.